Good morning. You may proceed. Thank you. Good morning, Your Honors. Alexander Silbert representing the defendant upheld in Sheldon Koyanagi. Your Honor, this case raises several issues related to whether the military exception to the Fourth Amendment applies in the search that occurred to my client. The first issue is whether the base was closed or not. Because if the base is not considered closed legally, then the military exception to the Fourth Amendment does not apply at all. And I think what's critical in this case is the threat level that Specialist Andres stated was occurring at the base at that time. And this is a Hickam Air Force base. He described there were five threat levels, normal, alpha, beta, Charlie, and delta. And on that particular day, the threat level was beta. And under the threat level of beta, while there were random inspection of motor vehicles and there was 100 percent ID check, civilians were allowed on base. All they had to do was have a proper ID and have a sponsor. However, under threat level Charlie or delta, that's the first time when civilians are not allowed on base. When it doesn't matter whether you have an ID. It doesn't matter whether you're sponsored. You have to either work on base or have special permission from the commander to be on the base. What is the source of your definition of what closed means? Not the threat level, but there have been some cases where it was kind of preposterous what they said closed meant. But what do you think it actually means as a legal matter? Well, the only definition that really seems to make sense is the one out of the Fourth Circuit in Jenkins where they used the definition of strictly limited. That the access to the military or civilians was strictly limited. The government's position seems to be if you have a military base that has barbed wire and a fence around it and you have gates and you have MPs with guns, that that's closed. But the problem with that argument is, one, it would apply to almost any base no matter what the threat level would be. But do we have evidence of that? In other words, I was trying to imagine some military bases that I've been on where like you could kind of come and go and you didn't have to show your ID. So I wondered, are there such bases? So you'd say, well, they would be open. Everybody would agree that would be an open base, maybe. That's Fort DeRussy. Right. There are some military installations that are like that, right? Well, Fort DeRussy is a hotel. It's a park and a hotel. Well, it's a park and a museum. We have some housing installations where they're just housing. There's no military equipment or anything that you can just drive on. So those would be open? Well, that would be, there's not even a fence. That would definitely be open. Okay. But even, but what the government seems to be arguing is if you put a fence around a you put guards and barbed wire and you have the MPs armed, then that necessarily means the base is closed. It doesn't seem like an outrageous proposition. Well, I think it is, Your Honor, because almost all military bases that have any kind of equipment or personnel on it are going to be, have a fence around and have barbed wire and have gate access. So, I mean, what you'd really be saying is really a military base is kind of like a border. It's just most military bases fall into this general exception category then. Well, that's what the government's position would be. Well, your objection is that you think that's too broad. I do, because the specialist says, first of all, there's no case that I think just says that that's enough. But here, Specialist Andres provided more testimony. And the testimony was that there are five threat levels. And one of the threat levels is called normal, where you can come and go. There's barbed wire, there's fences, there's guards, there's checks, but you can come and go. So, you know, this is, of course, we've all been skeptical of these, you know, red alert and orange alert, et cetera, put out by Homeland Security. Your position would be dependent upon the threat level as opposed to the nature of the base in general? Well, I think it could be a combination of both. For example, there's one case where, I think it was Andrews Air Force Base, where the President comes and goes and the Vice President comes and goes. And the court said, because of that unique circumstance to that base, that they determined it to be closed. It also had barbed wire, fences, and so forth. We had a case out of this court where the person was already on the base. The base was not considered to be closed. But then they tried to get onto a particular portion of the base where the ammunition dump was, and the court said that area of the base is closed. What the government's trying to say here is the entire base is closed simply because the only evidence that they presented was there was a guard, it was barbed wire, and there was fence. But Specialist Andrews' testimony contradicts that because he specifically said under two threat levels, we let civilians come and go completely. Even under Bravo, all we do is check their IDs and we check whether they have a sponsor and they can come and go. It's only when you get to Charlie and Delta that civilians may not come and go. Now, if it, even if this is a closed base, the second issue is, did my client impliedly consent to the search? And this is a rather unique case in that respect. Unlike other cases where you can drive up to the base and you become aware you're driving up to the base and you become aware by signs that you don't have to come to the base and you can turn around, as you may or may not know, when you get off the highway here, when you get on the highway H1 and you're going towards the airport, after the airport exit is the exit that goes to Hickam and Pearl Harbor. And all it says, this is a normal national highway sign, it says Pearl Harbor, Hickam exit. You go off that exit, there's nothing there at all that indicates that you're on military property, you're on the base or anything. You take that exit, it looks like a normal highway exit, it's three lanes, it's a massive exit. And only when you're within 300 yards of the guard is there a sign that says personnel will be subject to search. You're already on the military base. The testimony was that you're on that base a half a mile from the guard shack. There's also testimony that once you take that exit off the highway, there is no turning around, there's no exits, there's no way you're going to avoid getting to the guard shack. So my client takes the exit and he gets to the guard shack, there's no way he can turn around, nothing. There's no sign that says he's even going to be searched if he's subject to search because the sign talks about personnel. And we introduce the fourth chapter sign which talks about people being subject to search, not personnel. And he gets to that and there's no way you can turn around until you go through the gate, pass the sentry, and then you can turn around after it. That's the first time you have the right to turn around. And the case law says that one of the issues in implied consent is the ability to say no, I don't want to go through here, I don't want to do this search, I will leave, like in an airport. And this court has said in Morgan and Miles, one of the factors in implied consent is the ability to say no, I don't want to do this. My client had no ability to do that. Why did he do that? Well, he did in fact. Wasn't he trying to? It wasn't that he took the exit by mistake and just wound up there. He was trying to get on to the base and he was pulled aside afterwards as part of this process of getting on to the base. Absolutely, Your Honor. He wanted to go on the base because he wanted to go with those women on base. And they were filling out the forms to let him on base, right? That's correct. But before the search occurred, and that's what the case law talks about, before the search occurs, he is told, all right, pull over, so he hasn't gone past the guard check yet. The guard comes up and because of what he claimed to be indications of drunk driving, he orders him out of the car. At the time he ordered him out of the car, my client said, and this is in the transcript on page 18 and the excerpt of the record on page 20, he says, I want to make a U-turn. So let me just ask you the practical consequences as the gentleman at the gate should have said okay, you can turn around, although you appear to be drunk potentially, and drive back on the highway and get back on H1. No, our position would be this, Your Honor. The military exception, which is what the government is trying to use, says you don't need the regular Fourth Amendment probable cause. We're saying military exception here does not apply. We're not saying probable cause doesn't apply. We're saying the military exception doesn't apply. If you get the probable cause, then the guard, you can, and the court should analyze whether there was probable cause to do what the guard did. We're not suggesting the guard can say, oh, I can't do anything to make a U-turn. We're saying the analysis shifts from the military exception to whether there was probable cause. And we submit that there was no probable cause under the Hawaii DUI statute for what the guard did in this case when he searched my client. And that's because there wasn't enough sufficient evidence at the time he ordered my client out of the car and handcuffed him before the search occurred to have arrested him for drunk driving. One of the indicia of, I mean, he may have a reasonable suspicion, but one of the indicia of probable cause is a field sobriety test, which the guard said he was calling for, which never occurred. Usually he called for it. He was concerned this fellow was acting up. That's true. And he put the cuffs on him. He didn't know whether this fellow had resigned or not. I think that to say there wasn't probable cause just misses what the evidence shows. There's no way this fellow, the guard could have allowed this fellow to turn around and drive drunkenly back to H-1. Your Honor, if we're going to Fourth Amendment analysis, what the guard had at that point we submit was reasonable suspicion. And even if Your Honor wants to say he was acting up, which could justify putting on handcuffs. Well, he had every indication of being intoxicated. Well, actually there was a dissipating probable cause, Your Honor. He did everything correctly. There's no sign of bad driving. He had his seatbelt on. He was given multiple directions to follow by the MP. He followed every one of them to the level, to the letter. He pulled over the car correctly. He turned off the car. He took the key out of the ignition. He took his seatbelt off. He got out of the car. There's no evidence that he was staggering, falling or anything. In fact, the evidence that grew out of the initial glassy eyes and slurred speech, which we have no idea whether what can, you know, many conditions can bring that upon a defendant. And that's why it's reasonable suspicion. And we don't argue it's not reasonable suspicion. Okay. Let's hear from the government because you've used up all your time. Thank you. All right. Will you start with the probable cause, please? Yes, Your Honor. The probable cause to stop and to, um, good morning, Your Honor. I'm the Assistant United States, Assistant United States Attorney, Loretta Sheehan. Would you speak right into the microphone, lift it up? I'm sorry. You have a light voice, so you're going to have to speak out a little louder or lower your pitch. Yes, Your Honor. Good morning. My name is Loretta Sheehan. I'm an Assistant United States States Attorney for the United States of America. Starting with the issue of probable cause, the government's position is that there clearly was a probable cause to stop and to search Mr. Koyanagi when Mr. Koyanagi drove drunk, drove intoxicated onto Hickam Air Force Base. The evidence that was before the court and the specific filings that the court made were that Mr. Koyanagi's speech was slurred, his eyes were glassy, he smelled of alcohol. The secretary, Nolan Endress, described him as smashed. He said he was tore up. He said he appeared intoxicated. He was very intoxicated. This started right there. I mean, this is the classic DUI arrest that was founded on probable cause with a valid search incident to that arrest. And the analysis could stop there. However, what's been raised by the defense, what's been raised by both the government and the defense below was the military, the implied consent exception under the military base theory for warrantless searches. Should I move on to that or are there more questions on the probable cause? Well, I guess the question that the defense raises is, you know, I mean, judges are willing to do a big thing on the military base. We don't need all that if there was probable cause. I mean, that seemed to be the focus of the hearing was the military, but in some ways it's a straightforward case of is there probable cause or not. But the defense has said, well, you don't really he did everything in a normal fashion and there was no sobriety test, so that under the Hawaii statute, in terms of what constitutes driving under the influence, that you didn't have probable cause that would match the requirements of that statute, and you haven't addressed that. Oh, I'm sorry, Your Honor. On page 16 of the government's opening brief, I talk about what the Hawaii statute is. And actually, there isn't any requirement that there for probable cause to exist or for, in fact, for a person to be guilty of violating section 291E-61, which is our DUI statute here, driving under the influence statute here. You don't have to have any evidence of bad driving. You don't have to have any evidence that your driving is impaired at all. The statute reads... Well, that wasn't his point. His point was there wasn't evidence that the guy was actually impaired, not that he wasn't driving. He doesn't have to be driving. He doesn't have to be impaired. Nobody has contested that. The question is, was there probable cause to say he was under the influence? Well, two answers, Your Honor. First of all, the court below clearly found that there was evidence, and the standard for reversal would be clearly erroneous. The court below found there was plenty of evidence to believe that this man was driving under the influence of intoxicating liquor. Secondly, the statute itself does not require impairment. The statute requires influence. The statute requires to be under the influence of alcohol in an amount sufficient to impair, sufficient to impair the person's normal mental faculties or ability to care for the person in guard against casualty. There is no requirement in the statute that you actually have to have impaired driving, that there actually has to be impairment. Simply the ingestion of alcohol sufficient to impair a normal mental faculty. So in answer, there's two answers. The lower court found plenty of evidence based upon just the common sense viewing of Mr. Koinagi by the sentry. And secondly, the statute doesn't require impairment. So I do agree with the court that it is kind of a straightforward case. It's kind of a straightforward DUI. But there is this more interesting issue behind it that the court did, was particularly interested in and the government and defense counsel argued on the military base exception. So I'm not sure if I should move on to that. The government agrees that the test was set out by the Jenkins court and that is that a closed base is one that is simply, to which civilian access is simply restricted. I do disagree with defense counsel that the testimony was that Hickam under normal or alpha is people are free to, as he said, quote, come and go as they please. I believe the excerpts of record at page 8 indicate that that's not true at Hickam at all. When you go to Hickam Air Force Base, every single car is stopped all the time. You always have to have your identification. You are always asked to go to the guard check. You are always checked for your driver's license, for your no fault, for your safety check. And I don't believe there's specific testimony to this, but common sense would say, and you always can't be driving under the influence of intoxicating liquor. So it is a base to which civilian access is strictly limited. The guard place, where the car was, was on Hickam Field. It was on military property, wasn't it? Even before the guard base? Did I understand that Hickam extends some number of feet distant from the guard house? Yes, and that's the issue of notice, Your Honor. The way Hickam is set up and the evidence was the way Mr. Koyanagi drove on base is you drive on the highway and then there's a big green highway sign and it says, Hickam Air Force Base, Pearl Harbor. And there's an arrow and you can take that. And then you pass the second highway sign and it says, Pearl Harbor, that way. And then after that, if you keep going towards Hickam, you don't take that exit to Pearl, you enter Hickam Air Force Base. And only after you enter the base, then you see the sign that you're subject to search after that. We're not really talking about who owns the property so much as, frankly, you go to the airport. Half of the airport or part of the airport is on Hickam Air Force Base. Some of the runways are. So conceptually, it's not who owns the real property so much as are we talking about a portion of that property that's cordoned off from access? That's what I take your argument to be. So you're not concerned about the fact that you drive a certain number of feet to get to the guard gate and trying to get into the base, then you're saying that that's where it kicks in as being closed. Yes, Your Honor. That's what I would. But the basic problem we have here on the spectrum between open and closed, I mean, that's a yes, no kind of decision. But there are places in between so that, like most people who have lived in Hawaii, I've been on Hickam Air Force Base and did go through a guard station. But it's not, depending on the time, sometimes it's easier than others to get onto the base. Is it the government's position that, I don't know what the threat comms are called, but even, it's enough if you have to be stopped and shown a notification, that by itself, thereafter, from that point on, it's a closed base? Yes, Your Honor. I don't think, first of all, I don't think that to make it way too slippery in terms of the Fourth Amendment analysis and how much of a search are we going to allow if it's threat con Bravo and how much are we going to allow if it's threat con Charlie. And it's too slippery for law enforcement and it's too slippery in terms of the public, a court saying the public is on notice that they're subject to search. Well, in this case, the defense takes the position that you drive up to Hickam as opposed to driving up to Fort Chapter. Maybe you're not on notice. If it says personnel, and the suggestion is that if you're military personnel, you're subject to search. It also Can we fairly say that, yeah, you're on notice, you drive up to that gate, that you're going to get searched or you're at risk of being searched? I understand. The sign has to say personnel and, you know, that can be interpreted, but it doesn't say military personnel. It says personnel. The factors which matter to the Jenkins court were the signs, but in addition, just the common sense, it's a military base. But then what happens when he says, you know what, I don't really want to go on your military base after all. If that had happened in this case. And I thought he did. I thought he wanted to turn around. He was already under arrest. He was, once he realized I'm under arrest, I'm intoxicated and I had a bunch of crack in my pocket, then he said, I want to go. I want to turn around. And that's So that was a good move on him. I mean, that was Well, I don't think it was a nice try. But no. And clearly, if he I think the courts have been really clear that if if you do want to turn around and prior to entering a military base, you do have to be allowed to turn around. But that's not what happened in this case. All right. Thank you. Did you have anything you wanted to add? Yes. I'll just hit three quick points, since I know I'm out of time. The government says it's a slippery slope and the court should just adopt a flat out if the guards there and those fences and barbed wire, that's enough. But this court has already ruled that you have to look at the totality of circumstance. So we're not asking for a slippery slope. We're asking the court to consider the totality of the circumstances, which is the test in deciding whether there's a close base or not. Secondly, my client was ordered out of the car simply on the basis of the smell of alcohol, glassy eyes, and the way he behaved. He then said, I want to make a U-turn before he was told he was going to be searched and before he was handcuffed. So you can look at the transcript on page 20 and page 18 of the transcript, page 20 of the exercise record. And finally, the issue about being smashed and intoxicated, and that was the trial testimony, we're asking the court to ignore the district court's finding on that for this reason. In the first two under oath written statements that this specialist made, on the day in question and two days later, he never, ever said that my client was smashed or highly intoxicated, ever. Six months later, after having served a terror duty in Iraq, having come back, having met with the prosecutor twice, and being told by the prosecutor of the things he did wrong during the stop, he testifies for the first time on his oral testimony that my client was smashed and intoxicated. This is a guard who was trained in DUI law. He knew that that would be an important factor for a DUI case. He never, ever said that during his first two written under oath statements. I pointed that out in cross-examination over and over again. And we have in mind that there are some discrepancies between, actually, between the two statements and the hearing testimony as well. Thank you for your argument. The case of United States v. Koyanagi is submitted.
judges: Bright, McKeown, Clifton